**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DONNA TRAPANI,

      Petitioner,                      Civil No. 04-CV-72821-DT
                                     HONORABLE ARTHUR J. TARNOW
v.                               UNITED STATES DISTRICT JUDGE

CLARICE STOVALL,

      Respondent,
_____/

**<u>OPINION AND ORDER DENYING PETITION</u>**
**<u>FOR WRIT OF HABEAS CORPUS</u>**

      Donna Trapani, ("petitioner"), presently confined at the Scott Correctional

Facility in Plymouth, Michigan, has filed a petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254, in which she challenges her conviction and

sentence on one count of first-degree murder, M.C.L.A. 750.316; and one count

of conspiracy to commit first-degree murder, M.C.L.A. 750.157a.  For the reasons

stated below, the petition for writ of habeas corpus is **DENIED.**

**I.  Background**

      Petitioner was convicted of the above offenses after being jointly tried with

co-defendant Sylvia Ann Padgett in the Oakland County Circuit Court before

separate juries.

      Petitioner's conviction arose from the shooting death of Martha Gail Fulton

on the night of October 4, 1999, as she was leaving her job at the Orion

Township Public Library.  Petitioner had been involved in an extramarital affair

*Trapani v. Stovall,* 04-72821-DT

with the victim's husband, George Fulton, who had been employed by petitioner in her home health care business in Florida.  The evidence at trial established that petitioner had hired Sylvia Padgett, Patrick Alexander, and Keith Ouellette to come to Michigan to kill the victim.

George Fulton testified that petitioner knew that his wife worked at the Orion Township Public Library and that she drove a maroon van.  George Fulton admitted to having an extramarital affair with petitioner.  Fulton testified that he ended his affair with petitioner during the Fourth of July weekend in 1999, but continued to have some contact with her due to their business relationship.

Stephanie Bowden testified that she was Kevin Ouellette's fiancee. Bowden testified that Padgett drove a green Chevy Malibu.  Bowden testified that Padgett, Alexander, and Ouellette had a meeting at petitioner's house.  After the meeting, Ouellette informed Bowden that he was going to Michigan to "beat up a lady" at petitioner's request.

Brian Miller testified that Padgett told him that petitioner wanted her to murder her lover's wife.  When Padgett asked him if he knew anyone who would do this, Miller gave her the name "Mike", a man whom he had met in jail.

Padgett later called Miller from Michigan, claiming that she had located the victim but could not do what she needed to do [the murder], because the victim was with too many people.  Padgett informed Miller that Alexander was with her.

2

*Trapani v. Stovall,* 04-72821-DT

Padgett continued to inquire whether "Mike" was available.  Petitioner also spoke with Miller on the telephone, informing him that her boyfriend's wife was making it difficult for them.  Petitioner told Miller "[w]hy not just take her out and be rid of the problem."  Petitioner also asked Miller if he could find his friend from jail.

Padgett later called Miller from petitioner's house and informed him that she had found a "Mike" and that petitioner believed that this was the person that Miller had referred to.

In the third week of October, 1999, Padgett and her mother came to Miller's house.  Padgett was scared and crying.  Padgett informed Miller that they had cut the victim's tire and that Ouellette had jumped out of the car and shot the victim several times.

Patrick Alexander testified that he was going to plead guilty to second-degree murder and solicitation to murder, in exchange for his testimony.  Alexander was Padgett's boyfriend.  Petitioner was at Padgett's house one day and began discussing her problems with her boyfriend's wife and how she wanted to find someone to kill somebody for her.

Petitioner subsequently offered Alexander $ 1,000.00 and a rental car to come to Michigan to do surveillance on the victim.  Petitioner gave Alexander a legal pad with writing on it, a photograph, and a map of Lake Orion, Michigan.

3

*Trapani v. Stovall,* 04-72821-DT

The legal pad had the victim's work schedule, her name, her children's names, a telephone number and the make and color of the victim's vehicle.  Alexander did not go to Michigan and his plan at the time was to take the $ 1,000.00 from petitioner.

Several weeks later, petitioner offered Alexander and Padgett $ 15,0000.00 to kill the victim.  Padgett and Alexander came to Michigan and spent several days following the victim, but returned to Florida without committing the murder, because they never had an opportunity to get the victim alone.  Petitioner suggested that they kidnap the victim and bring her to Florida and also suggested injecting the victim with anti-freeze.  Petitioner also gave Padgett a typed suicide note dated September 13, 1999.

Alexander testified that Padgett, petitioner, Ouellette and himself had a meeting at petitioner's house.  Padgett introduced Ouellette as Brian Miller's friend "Mike".  Petitioner told Ouellette that she wanted the victim murdered.  Ouellette agreed to do it.  At a second meeting, Alexander and Padgett agreed to accompany Ouellette to Michigan.

Alexander testified that they arrived at the Orion Township Public Library at about 8:15 in a green Chevy Malibu.  Padgett pointed out the victim's van to Ouellette.  Alexander went into the library to find the victim, but could not locate her.  Alexander had a photograph of the victim with him.  Ouellette got out of the

4

*Trapani v. Stovall,* 04-72821-DT

car and punctured the victim's tire.

When the library closed, the victim left the library with the other employees and got into her van.  She attempted to leave the parking lot but noticed that she had a flat tire.  At this point, Alexander pulled their car up to the van and Ouellette got out and shot the victim several times.

Alexander testified that a few days after their return to Michigan, petitioner came to Padgett's house with some news articles about the victim's murder. Petitioner remarked that "this had to be a job done by a professional" and complemented Ouellette for doing a good job.

Oakland County Sheriff's Department Detective Christopher Wundrach searched Sybil Padgett's house.  On a bookshelf in the living room, Wundrach discovered a photograph of the victim which George Fulton later indicated had been taken from his photograph album.  Wundrach also found a handwritten note with petitioner's pager number, petitioner's mother's name, the name "Gail Fulton", the Fultons' telephone number, the words "Lake Orion Library", the names of the Fultons' children, and the Fultons' address on it.  The victim's work schedule was also on this paper.  Petitioner's thumbprint was recovered from this note.  These items were inside an envelope with the names "Donna" and "George" on it.  The words "Dodge van, maroon," were also on the envelope with a license plate number.  Wundrach also discovered a typed suicide note which

5

*Trapani v. Stovall,* 04-72821-DT

had purportedly been written by the victim. Wundrach later discovered that the green Chevy Malibu which had been used in the murder had been leased by petitioner.

Oakland County Sheriff's Department Deputy John Meiers interviewed petitioner at her house on December 1, 1999. Petitioner told Meiers that she was pregnant and had a slight protusion in her waist area. Petitioner informed Meiers that she was due to give birth in two or three weeks. At the end of the interview, petitioner was placed under arrest. The police later discovered that she had stuffed place mats into her pants.

Kevin Ouellette testified that he had been convicted in a separate trial of first-degree murder and conspiracy to commit murder. In exchange for his testimony, Ouellette would be permitted to serve his sentence in a federal facility in Maine closer to his family. Ouellette's testimony mirrored that of the other prosecution witnesses regarding the planning and the execution of the murder.

The parties stipulated that petitioner had been diagnosed with cancer.

Petitioner testified that she had been divorced in February of 1999. Petitioner claimed that George Fulton promised to marry her. Petitioner claimed that she became pregnant in March of 1999, although the pregnancy ended with a miscarriage in July, 1999. Petitioner admitted to feigning her pregnancy after this point, in order to speed up the sale of her business. Petitioner denied writing

6

*Trapani v. Stovall,* 04-72821-DT

the suicide note which had been recovered from Padgett's house.  Petitioner

denied hiring anyone to kill the victim.

Petitioner was found guilty as charged.  Petitioner's conviction was affirmed

on appeal by the Michigan Court of Appeals. *People v. Trapani,* No. 232330

(Mich.Ct.App. May 27, 2003).  Petitioner's application for leave to appeal was

rejected as untimely by the Michigan Supreme Court.

Petitioner now seeks the issuance of a writ of habeas corpus on the

following grounds:

> I.  Petitioner was deprived of her U.S. Constitutional rights to due
> process guaranteed by Amendment V and XIV when hearsay
> statements were introduced that did not satisfy the exception to the
> conspiracy rule for introduction of hearsay.
>
> II.  Petitioner was deprived of her United States and Michigan
> constitutional rights under Amendment VI to effective assistance of
> trial counsel when counsel failed to move for a change of venue,
> object to an error in jury selection, and failed to file for severance
> from a joint trial.
>
> III.  Petitioner was deprived of her U.S. Constitutional rights to due
> process guaranteed by Amendment V and Petitioner was deprived of
> her right to counsel guaranteed under Amendment VI when the
> police continued interrogation after Petitioner requested counsel.

## II.  Standard of Review

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless
> the adjudication of the claim–

7

*Trapani v. Stovall,* 04-72821-DT

   (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

   (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

### III. Discussion

### A. The Confrontation Clause claim.

Petitioner first claims that the trial court erred in admitting certain

*Trapani v. Stovall,* 04-72821-DT

extrajudicial statements that did not properly qualify for admission under the co-conspirator exception to the hearsay rule. [1]

Petitioner contends that the trial court erred in allowing Stephanie Bowden to testify about statements made to her by Ouellette, in which Ouellette told Bowden that he was going to go to Michigan to beat up a lady at petitioner's request. Petitioner also contends that the trial court erred in allowing Brian Miller to testify about statements which Padgett had made to her subsequent to the murder, in which she described the events of the crime and sought advice on how to evade the police.

The Michigan Court of Appeals concluded that Ouellette's statement to Bowden was admissible under the co-conspirator exception to the hearsay rule, because it was made in furtherance of the conspiracy. *People v. Trapani,* Slip. Op. at * 3. The Michigan Court of Appeals further ruled that Padgett's

---

[1] Respondent contends that this claim, as well as petitioner's other two claims, is procedurally defaulted because petitioner failed to exhaust her state court remedies by filing a timely application for leave to appeal with the Michigan Supreme Court. Petitioner contends that any procedural default should be excused because of a twenty two day delay in receiving the Michigan Court of Appeals' decision, because she was suffering from several physical illnesses at the time, and due to the fact that various prison officials did not cooperate in expeditiously filing her application for leave to appeal. In this case, because "the procedural default issue raises more questions than the case on the merits", this Court will assume, for the sake of resolving the claims, that there is no procedural default by petitioner and will decide the merits of the claims. *Falkiewicz v. Grayson,* 271 F. Supp. 2d 942, 948 (E.D. Mich. 2003). This Court makes no ruling on the Michigan Supreme Court's fifty six day time limit, which provides no exceptions for the untimely filing of an application for leave to appeal.

*Trapani v. Stovall,* 04-72821-DT

statements to Miller should not have been admitted under the co-conspirator

exception to the hearsay rule, but could have been admitted as statements

against penal interest pursuant to M.R.E. 804(b)(3). *Id.*

The Confrontation Clause of the Sixth Amendment does not bar all

hearsay evidence introduced against a criminal defendant. *Dutton v. Evans*, 400

U.S. 74, 80 (1970).  At the time of petitioner's conviction and direct appeal, the

United States Supreme Court held that the veracity of hearsay statements is

sufficiently dependable to allow the untested admission of such statements

against an accused when:

> 1.  the evidence falls within a firmly rooted exception to the hearsay rule; or
> 2. it contains particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything, to the statement's reliability.

> *Ohio v. Roberts*, 448 U.S. 56, 66 (1980).

On March 8, 2004, the United States Supreme Court overruled its holding

in *Ohio v. Roberts, supra,* and held that out of court statements that are

testimonial in nature are barred by the Sixth Amendment Confrontation Clause

unless the witness is unavailable and the defendant had a prior opportunity to

cross-examine the witness, regardless of whether such statements are deemed

reliable by the court. *Crawford v. Washington,* 124 S. Ct. 1354, 1365-74 (2004).

At the time of petitioner's conviction and direct appeal, however, *Ohio v. Roberts*

10

*Trapani v. Stovall,* 04-72821-DT

was still good law.

The phrase "clearly established federal law," for purposes of § 2254(d)(1), is the governing legal principle or principles set forth by the United States Supreme Court at the time that the state court renders its decision. *Lockyer v. Andrade,* 538 U.S. 63, 71-72 (2003).  A habeas court may look only at the holdings of the United States Supreme Court as they existed at the time of the relevant state court decision to determine whether the state court decision was contrary to, or an unreasonable application of, clearly established federal law. *Mitzel v. Tate,* 267 F. 3d 524, 530-31 (6th Cir. 2001).  Because *Ohio v. Roberts* was still good law at the time that the Michigan Court of Appeals rendered its decision in this case, this Court must determine whether the Michigan Court of Appeals' decision to affirm petitioner's conviction was contrary to, or an unreasonable application of, the Supreme Court's holding in *Ohio v. Roberts. See Dorchy v. Jones,* 398 F. 2d 783, 788 (6th Cir. 2005). [2]

At the time of petitioner's conviction, the Supreme Court held that the co-conspirator exception to the hearsay rule is firmly enough rooted in the jurisprudence that a court need not independently inquire into the reliability of

---

[2]  Moreover, the Supreme Court's holding in *Crawford* would not have any impact on this case, because the courts which have addressed this issue have uniformly held that statements made by one participant to another which are intended to further the criminal enterprise are nontestimonial in nature. *See United States v. Martinez,* 430 F. 3d 317, 329 (6th Cir. 2005)(collecting cases).

11

*Trapani v. Stovall,* 04-72821-DT

such statements. *See Bourjaily v. United States*, 483 U.S. 171, 183 (1987).

Before a trial court can admit a co-conspirator's statement under the co-conspirator exception to the hearsay rule, a court must be satisfied that the statement actually falls within the definition of the rule and there must be evidence that there was a conspiracy involving the declarant and the nonoffering party and that the statement was made in the course of and in furtherance of the conspiracy. *Bourjaily,* 483 U.S. at 175.

Petitioner first contends that the trial court erred in relying on the hearsay statements themselves to prove the existence of the conspiracy in this case. Bound only by the rules of privilege, a trial judge may consider any evidence whatsoever, including the proffered hearsay statements, in determining whether statements are admissible under the co-conspirator exception to the hearsay rule. *Bourjaily,* 483 U.S. at 181.  Nonetheless, since the decision in *Bourjaily*, all federal circuit courts which have addressed the issue "[h]ave explicitly held absent some independent, corroborating evidence of defendant's knowledge of and participation in the conspiracy, the out-of-court statements remain inadmissible." *United States v. Clark,* 18 F. 3d 1337, 1341-42 (6th Cir. 1994).  However, a trial court has the prerogative to conditionally admit co-conspirator statements subject to a later demonstration of their admissibility by a preponderance of the evidence. *See United States v. Robinson,* 390 F. 3d

12

*Trapani v. Stovall,* 04-72821-DT

853, 867 (6th Cir. 2004). Therefore, even if there were no independent evidence at the time of the admission of these statements concerning the existence of a conspiracy and petitioner's involvement in it, these statements could be admitted under the co-conspirator exception to the hearsay rule if independent evidence of petitioner's involvement in the conspiracy was later admitted at the trial. *See United States v. Fusse,* 122 Fed. Appx. 243, 247 (6th Cir. 2005). In light of the ample evidence of petitioner's involvement in this conspiracy which subsequently was adduced at trial, these statements qualified under the co-conspirator exception, even if there were no independent evidence of petitioner's involvement in the conspiracy at the time that Bowden or Miller testified.

Petitioner also contends that Ouellette's statement to Bowden was not made in furtherance of the conspiracy, because it was not made with the intention of inducing others to join, to allay their fears, or to otherwise preserve or promote the conspiracy. Statements which identify participants and their roles in the conspiracy qualify as statements made in furtherance of the conspiracy so as to be admissible under the co-conspirator exception to the hearsay rule. *See United States v. Monus,* 128 F. 3d 376, 393 (6th Cir. 1997); *Clark,* 18 F. 3d at 1342. In this case, Ouellette's statements to Bowden that petitioner had asked him to beat up the victim identified petitioner as a participant in the conspiracy and her role in it and could therefore qualify as being made in furtherance of the

13

*Trapani v. Stovall,* 04-72821-DT

conspiracy.

Likewise, at least part of Sylvia Padgett's statements to Brian Miller, in which she sought advice on how to evade the police could also have qualified as falling within the co-conspirator exception to the hearsay rule. Statements which are designed to facilitate the concealment of a conspiracy's criminal accomplishments are admissible as co-conspirator statements made in furtherance of the conspiracy. *See United States v. Franklin,* 415 F. 3d 537, 552 (6th Cir. 2005).

Assuming that none of these statements were admissible under the co-conspirator exception to the hearsay rule, their admission was harmless error and did not constitute a substantial and injurious influence or effect on the jury's verdict, in light of the sufficient corroborating testimony of petitioner's guilt from other witnesses. *See Anthony v. DeWitt,* 295 F. 3d 554, 564 (6th Cir. 2002). In this case, the hearsay evidence was cumulative of testimony from Ouellette and Alexander that petitioner had asked Ouellette to murder the victim. Brian Miller had also testified that petitioner had expressed a desire to have the victim killed. There was also evidence that the Chevy Malibu used in the murder had been leased by petitioner. Other circumstantial evidence linked petitioner to the crime. The admission of this hearsay evidence was therefore harmless. Petitioner is not entitled to habeas relief on her first claim.

14

*Trapani v. Stovall,* 04-72821-DT

**B. The ineffective assistance of counsel claims.**

Petitioner next contends that she was deprived of the effective assistance of trial counsel.

To show that she was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.* In other words, petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689. Second, the defendant must show that such performance prejudiced his defense. *Id.* To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

1. Venue claim.

Petitioner first claims that her trial counsel was ineffective for failing to move for a change of venue due to the extensive pre-trial publicity in this case.

15

*Trapani v. Stovall,* 04-72821-DT

In rejecting this claim, the Michigan Court of Appeals noted that any prospective jurors who had learned about the case from media coverage were taken into chambers and questioned separately by the trial court to uncover any possible juror bias.  Three prospective jurors were excused by the judge for cause, while the remaining jurors indicated that they could be fair and impartial. Because the record did not establish that a change of venue was justified, the Michigan Court of Appeals concluded that counsel was not ineffective for failing to move for a change of venue.

Petitioner has presented no evidence which showed the type of extensive or inflammatory pre-trial publicity that has been condemned by the U.S. Supreme Court.  The U.S. Supreme Court has emphasized the negative effect of pre-trial publicity when the publicity amounts to an "out-of-court campaign to convict", reflecting "inflamed public sentiment." *De Lisle v. Rivers*, 161 F. 3d 370, 385 (6th Cir. 1998)(quoting *Shepherd v. Florida*, 341 U.S. 50, 52-53 (1951)). However, coverage that consists of "straight news stories rather than invidious articles which tend to arouse ill will and vindictiveness" are not so troubling. *Id.* (quoting *Beck v. Washington*, 369 U.S. 541, 556 (1962)).

Petitioner has also failed to show actual prejudice to her case from the jurors' exposure to the pre-trial publicity.  To demonstrate actual prejudice, a habeas petitioner must show that one or more jurors entertained an opinion

16

*Trapani v. Stovall,* 04-72821-DT

before trial that petitioner was guilty and that these jurors could not put this prejudice aside and render a verdict based solely upon the evidence. *Dell v. Straub,* 194 F. Supp. 2d 629, 655 (E.D. Mich. 2002).  The test for whether pre-trial publicity necessitates a change in venue is whether a juror exposed to pre-trial publicity can lay aside his or her impression or opinion and render a verdict based upon the evidence presented in court. *Id.*

Since petitioner has failed to show any actual or presumed prejudice on the jury's part in this case because of pre-trial publicity, she is unable to establish that counsel was ineffective for failing to request a change of venue. *Dell,* 194 F. Supp. 2d at 649.

2. Separate trial claim.

Petitioner next claims that trial counsel was ineffective for failing to move for a separate trial from her co-defendant, Sylvia Ann Padgett.

"[U]nder Michigan law, severance is required only when a defendant shows that it is necessary to avoid prejudice to his substantial rights." *Clark v. McLemore,* 291 F. Supp. 2d 535, 545 (E.D. Mich. 2003)(citing M.C.R. 6.121(C)). "[T]here is no absolute right to a separate trial, and joint trials are strongly favored 'in the interest of justice, judicial economy and administration.'" *Id.* (quoting *People v. Etheridge*, 196 Mich. App. 43, 52; 492 N.W. 2d 490 (1992)). Severance should only be granted "if there is a serious risk that a joint trial would

17

*Trapani v. Stovall,* 04-72821-DT

compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *People v. Hana*, 447 Mich. 325, 359-60; 524 N.W. 2d 682 (1994)).

Petitioner's primary claim is that many of the witnesses would not have been able to testify against her had she been granted a trial separate from co-defendant Padgett. A review of the record, however, shows that most, if not all, of the evidence in this case could have been admitted against petitioner in a separate trial. Certainly, the testimony of co-defendants Alexander and Ouellette that petitioner had hired them to kill the victim would have been admissible. Miller's testimony that petitioner had discussed the problems that she was having with the victim and her suggestion "[w]hy not just take her out and be rid of the problem " was certainly admissible against petitioner as proof of her motive or intent. The police would still have been able to testify about any evidence which had been seized from Padgett's house which linked petitioner to the crime.

In order to show that she was prejudiced by her joint trial with Padgett, petitioner must show that had her counsel moved for severance and had the motion been granted so that she was tried separately, there was a "reasonable probability" that she would have been acquitted. *See Rastafari v. Anderson,* 278 F. 3d 678, 689 (7th Cir. 2002). In this case, petitioner was not prejudiced by

18

*Trapani v. Stovall,* 04-72821-DT

counsel's failure to move for severance, because even had severance been granted, the exact same evidence would have been admitted against petitioner. *Id.*

   3.  Jury selection claim.

   Petitioner finally claims that counsel was ineffective for failing to object to the trial court's use of an impermissible "struck jury method."  At one point, the prosecutor asked to excuse a juror for cause.  The trial court judge indicated that in order to speed things up, he would excuse another juror who had business and child care issues.  Petitioner's counsel indicated that he had no objection. Later, the prosecutor exercised a peremptory challenge of one juror and a challenge for cause of another juror at the same time.  Again, defense counsel indicated that he had no objection.  Petitioner's counsel exercised eight peremptory challenges and expressed satisfaction with the jury.

   The Michigan Court of Appeals rejected petitioner's claim.  Although noting that M.C.R. 2.511(F) provides for the replacement of each juror as soon as one is excused, M.C.R. 2.511(A) no longer mandates automatic reversal of a conviction where the deviations from the standard jury process do not implicate the "struck jury method" or affect a defendant's right to exercise his or her peremptory challenges pursuant to M.C.R. 2.511(F). *People v. Trapani,* Slip. Op. at * 4.  The Michigan Court of Appeals concluded that petitioner had failed to

19

*Trapani v. Stovall,* 04-72821-DT

show prejudice from the deviation in the jury selection procedure, particularly where her right to exercise her peremptory challenges was not impeded. *Id.*

Since there was no impropriety in the jury selection process, trial counsel was not ineffective for failing to object to the method employed by the trial court in this case. *See Lewis v. Bennett,* 328 F. Supp. 2d 396, 409-10 (W.D.N.Y. 2004). Petitioner is therefore not entitled to habeas relief on her second claim.

**C. The claim that petitioner's statement was obtained in violation of her right to counsel.**

In her final claim, petitioner alleges that the police continued to interrogate her at her house after she had requested counsel.

The Michigan Court of Appeals rejected petitioner's claim on several grounds. The court first rejected petitioner's claim on the ground that petitioner's questioning did not involve a custodial interrogation subject to the dictates of *Miranda,* in light of the fact that petitioner was questioned in her own home, was repeatedly told that she was not under arrest, and was repeatedly told that she could end the interview at any time. *People v. Trapani,* Slip. Op. at * 5. The Michighan Court of Appeals further concluded that petitioner's statement that she would "like to be able to call" her lawyer, was not an unambiguous invocation of the right to counsel. *Id.*

Once an accused invokes his right to counsel during custodial

20

*Trapani v. Stovall,* 04-72821-DT

interrogation, that interrogation must cease until counsel is made available, unless the accused initiates further conversation with the police. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

A number of courts have held that the rule established in *Edwards* is applicable only if a person is subjected to an interrogation while in custody. *See United States v. Martin,* 95 Fed. Appx. 169, 178, n. 8 (6th Cir. 2004); *Burket v. Angelone*, 208 F. 3d 172, 197 (4th Cir. 2000); *United States v. Wyatt*, 179 F. 3d 532, 538 (7th Cir.1999); *United States v. Bautista*, 145 F. 3d 1140, 1147 (10th Cir. 1998); *United States v. Ridley,* 199 F. Supp. 2d 704, 713 (S.D. Ohio 2001). Because petitioner was not subjected to custodial interrogation in this case, the dictates of *Edwards* do not apply.

Moreover, assuming that *Edwards* applies, petitioner is unable to show how she was prejudiced. The only statement that petitioner appeared to make to Detective Meiers was a statement that she was pregnant. Even if petitioner were interrogated in violation of *Edwards*, the admission of these statements that she made to Detective Meiers did not result in actual prejudice to petitioner, because her statement was duplicative of other evidence that was introduced in this case, including petitioner's own trial testimony, in which she admitted to feigning her pregnancy after her miscarriage in July of 1999. *See Kyger v. Carlton,* 146 F. 3d 374, 382-83 (6th Cir. 1998). Petitioner is not entitled to

21

*Trapani v. Stovall,* 04-72821-DT

habeas relief on her final claim.

## IV.  ORDER

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is **DISMISSED WITH PREJUDICE.**


**s/Arthur J. Tarnow**
**Arthur J. Tarnow**
**United States District Judge**

**Dated:  January 17, 2006**

**I hereby certify that a copy of the foregoing document was served upon counsel of record on January 17, 2006, by electronic and/or ordinary mail.**

**s/Catherine A. Pickles**
**Judicial Secretary**

22